IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CR-172-F-10

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| NATHUNE JAMERSON MYLES, | ) | |
| | ) | |
| Defendant. | ) | |

Defendant Nathune Jamerson Myles seeks an order declaring he is not mentally competent to stand trial in this matter pursuant to 18 U.S.C. § 4241(d). The court held a competency hearing on July 7, 2016. George P. Corvin, M.D., DFAPA, testified as Defendant's expert witness in the field of forensic psychiatry. Joshua Lapin, M.A. – a Psychology Intern with Federal Medical Center at Butner ("Butner") – testified as the Government's witness in the field of forensic psychology.[1] For the reasons that follow, the court concludes Defendant is competent to stand trial in this matter.

## I. BACKGROUND

This case arises from a joint investigation by the Sheriff's Office in Cumberland County, North Carolina ("CCSO"), the CCSO Special Response Team, the Cumberland County Bureau of Narcotics and the Drug Enforcement Administration into a drug trafficking organization's distribution of cocaine and crack in the Godwin, North Carolina and Dunn, North Carolina areas between 2000 and 2014.

---

[1] During the hearing, the parties stipulated that Dr. Corvin and Mr. Lapin are experts in the fields of forensic psychiatry and psychology, respectively. Tr. at 5:18-25, 6:1-4.

On May 27, 2015, a grand jury returned an indictment charging Defendant and eighteen co-defendants with multiple counts. Defendant was charged with conspiracy to manufacture, distribute, dispense and possess with intent to distribute more than 5 kilograms or more of cocaine and 280 grams or more of cocaine base (crack), 21 U.S.C. § 846 (count one). On August 25, 2015, the court allowed Defendant's motion for competency hearing and ordered Defendant be evaluated by a Butner psychiatrist or psychologist for both competency and sanity pursuant to 18 U.S.C. §§ 4241(b) and 4242(a), respectively.[2] [DE 275].

On December 8, 2015, Mr. Lapin prepared a report under the supervision of forensic psychologist, Kristina P. Lloyd, Psy.D.[3] In his report, Mr. Lapin concluded Defendant is competent to stand trial and assist in his defense.[4] [DE 347]. On December 9, 2015, Mr. Lapin prepared a second report – again under Dr. Lloyd's supervision – wherein he concluded that Defendant was not insane.

Upon conclusion of his evaluation at Butner, Defendant sought a second opinion and ultimately retained the services of Dr. Corvin. On April 25, 2016, Defendant submitted a report dated April 18, 2016 from Dr. Corvin. [DE 447]. Dr. Corvin opined that Defendant is incapable of proceeding to trial as a result of his premorbid intellectual limitations and the exacerbating effects on these impairments stemming from his prior traumatic brain injury.

---

[2]     The testimony at the hearing was limited to the competency issue.

[3]     Accompanying that report is a Certificate of Restoration of Competency to Stand Trial ("the Certificate") signed by M.K. Lewis, the Associate Warden at Butner. [DE 347 at 3]. During the competency hearing, both Mr. Lapin and Dr. Lloyd testified that the Certificate was issued in error. *See* Tr. at 134:5-7 (testimony by Mr. Lapin describing the issuance of the Certificate as "a clerical error"); *id.* at 235:22-25, 236:1-12 (testimony by Dr. Lloyd explaining the review process of evaluation reports and agreeing that at some point "the process broke down") [DE 556].

[4]     The court's receipt of the December 9, 2015 report is not indicated on the docket sheet.

## II.    EXPERTS' REPORTS AND COMPETENCY HEARING TESTIMONY

### A.    Defendant's Background

In their reports, Mr. Lapin and Dr. Corvin provided a summary of Defendant's background based upon their review of Defendant's available medical, education and Social Security Administration ("SSA") disability determination records. Their hearing testimony was consistent with their reports.

Defendant completed the tenth grade with a cumulative GPA of 0.97. According to a 1989 psychological evaluation prepared by Debbie Ross, M.A. (at which time Defendant was 13 years old), Defendant received services for "behaviorally/emotionally handicapped students" while in middle school. The report referenced a 1986 psychological evaluation which estimated Defendant's overall intelligence to be in the borderline to low average range; however, it was noted that this estimate may have been an under-representation of Defendant's true abilities due to his "minimal responsiveness and seeming depression at the time of testing." During her evaluation, Ms. Ross administered a Wechsler Intelligence Scale for Children-Revised ("WISC") to Defendant. Defendant achieved a full scale IQ score of 73, placing him in the high Educable Mentally Handicapped to borderline range of functioning. Ms. Ross noted, however, that Defendant's score may have been an underrepresentation of his true abilities due to his brief responses, lack of motivation and potential depression.

In 2015, Ashley Weeks, M.A., a SSA Disability Determination Services consultant, administered the Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS") to Defendant.[5] Defendant achieved a full scale IQ of 52, placing him in the extremely low range of functioning. While Ms. Weeks found that Defendant exerted good effort, her report is silent as to effort

---

[5]     Ms. Weeks was supervised by E. J. Burgess, Psy.D.

testing.[6]   Ms. Weeks assigned Defendant an intellectual disability disorder diagnosis.   Defendant

is deemed disabled within the meaning of the Social Security Act.[7]

Defendant's medical history includes diagnoses of traumatic brain injury ("TBI"),[8]

sarcoidosis,[9] seizure disorder and pneumonia, arthropathy and seborrhea capitis.[10]   While at

Butner, Defendant underwent a CT scan,[11] which indicated a finding consistent with "plaque

meningioma."[12]   Based on this finding, Butner medical staff referred Defendant for a

neurosurgery consult, which did not occur due to Defendant's discharge.[13]   Defendant's mental

health history also indicates numerous diagnoses, including a cognitive disorder (not otherwise

specified), alcohol abuse, antisocial personality disorder and a history of chronic depression.

---

[6]   Tr. at 41:15-18; 106:9-12.

[7]   A person is "disabled" under the Social Security Act if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B). "[A] physical or mental impairment is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 1382c(a)(3)(D).

[8]   Defendant was involved in a car accident on January 1, 1999. After undergoing surgery, Defendant was diagnosed with traumatic brain injury.  Defendant was released from the hospital on February 5, 1999.

[9]   During the hearing, Dr. Corvin testified that Defendant's sarcoidosis diagnosis occurred subsequent to his evaluation at Butner. *Id.* 115:21-23, 116:4-10. Mr. Lapin confirmed staff members' awareness of the sarcoidosis diagnosis; however, he expressed uncertainty as to whether the Butner medical staff bore responsibility for the initial diagnosis thereof. *Id.* at 153:16-22.

[10]   Tr. at 153:3-12, 23-25.

[11]   Mr. Lapin testified that as a result of Defendant's TBI, Defendant underwent an MRI while at Butner on October 19, 2015. Mr. Lapin testified the MRI was necessary as he wished "to consider any issues that could have impacted [Defendant's] competency to stand trial" and "to gain a sense of how [Defendant's] brain is." Based on the MRI findings, Defendant underwent a CT scan on October 22, 2015. *Id.* at 23:25, 24:1, 149:5-9, 154:11-13, 17-18, 24-25,156:1-2

[12]   Both Mr. Lapin and Dr. Corvin described meningioma as a "benign" tumor. *Id.* at 24:1, 155:18.

[13]   *Id.* at 149:5-15.

**B.     Dr. Corvin's Report and Testimony**

Dr. Corvin's report reflects personal observation, a review of the indictment against Defendant, a review of Mr. Lapin's report, consultation with defense counsel and a forensic evaluation in addition to the records noted in Part II(A) *supra*. Dr. Corvin examined Defendant on March 17, 2016 "for about two hours and 45 minutes" and then "briefly" the morning of the competency hearing.[14] Defendant was "cooperative" throughout the evaluation process.[15]

1.     Evaluation of Defendant

During the March 17, 2016 meeting, Dr. Corvin observed that Defendant appeared "chronically depressed," "dysthymic" and "almost apathetic" and exhibited an "impaired executive function."[16] Defendant also spoke in a monotone voice, engaged in limited eye contact and became "easily frustrated."[17]   Defendant could carry on a conversation "[i]n a very brief window" and he understood "to some extent" questions asked of him.   However, due to Defendant's "frontal lobe executive dysfunction problems," Dr. Corvin characterized Defendant's ability to retain information as "not good."[18]

Dr. Corvin utilized the Folstein Mini Mental Status Examination ("the Folstein") and the Montreal Cognitive Assessment ("MOCA")[19] to screen for a "mild neurocognitive impairment"

---

[14]     *Id.* at 14:20-25.

[15]     *Id.* at 34:21-23.

[16]     *Id.* at 15:10, 14, 27:16-17.

[17]     *Id.* at 32:14-20.

[18]     *Id.* at 28:21-22.

[19]     *Id.* at 88:9-11 (explaining the MOCA "seems to be more sensitive to detecting mild levels of neurocognitive impairment than the Folstein").

diagnosis.[20] He explained individuals with this diagnosis may later develop "dementia or . . . Alzheimer's."[21] While agreeing this case does not concern such impairments, Dr. Corvin described Defendant's impairments as "a dementing type" in light of his symptoms, including his memory impairment.[22]

Based on Defendant's Folstein results, he falls in the "borderline impaired range." In Dr. Corvin's opinion, Defendant "didn't do that terribly on the Folstein."[23] While the test generally takes five to ten minutes to administer, it took Defendant "10 to 15 minutes."[24] According to Dr. Corvin, the Folstein is "of limited utility" as it is "just a screen to indicate what else needs to be done"[25] and is not administered with the intent of rendering a diagnosis.[26] Dr. Corvin testified further that "the best practice is to . . . conduct the Folstein over a period of time . . . in a rehab setting or in a setting where you're tracking someone over a course of years . . . ."[27] The MOCA is a one-page thirty-question test that generally takes approximately 10 minutes to administer. Defendant took "a good 30 minutes or so" to complete the MOCA and did not perform well.[28]

---

[20]     *Id.* at 68:8-15; *see id.* at 68:24-25, 69:7-8 (stating these screen measures are not substitutes for a neuropsychological assessment).

[21]     *Id.* at 88:14-17.

[22]     *Id.* at 88: 23-25, 89:3-12.

[23]     *Id.* at 86:15-25, 87:1.

[24]     *Id.* at 52:7-8, 84:24-25.

[25]     *Id.* at 82:15-20.

[26]     *Id.* at 84:20-23.

[27]     *Id.* at 83:3-6.

[28]     *Id.* at 52:9-11, 85:6-9; 89:16-19.

In Dr. Corvin's opinion, Defendant gave a "compensatory effort" on the Folstein and the MOCA.[29] Dr. Corvin explained he did not administer effort testing – which he does"[i]n most [competency] cases"[30] – for three reasons: (1) it was "clinically unnecessary" because Defendant's "clinical presentation currently is . . . in line with his documented injuries, and . . . with descriptions of him pre-arrest in this matter;"[31] (2) his "good clinical common sense;"[32] and (3) the cost associated with such testing.[33] Dr. Corvin acknowledged Defendant's documented history of issues with effort, both prior and subsequent to his TBI.[34] In Dr. Corvin's opinion, however, "what has been perceived as a lack of effort [by Mr. Lapin] is an organic effect of . . . all of [Defendant's] conditions in total . . . , but first and foremost an effect of his brain injury."[35]

2.   Diagnoses

Dr. Corvin assigned Defendant the following mental disorder diagnoses:[36] (1) intellectual development disorder, (2) major neurocognitive disorder due to history of brain injury,

---

[29]     *Id.* at 34:5-6.

[30]     *Id.* at 65:19-24.

[31]     *Id.* at 66:16-22.

[32]     *Id.* at 61:22-25, 62:15-21. Dr. Corvin noted, for example, that during screening, Defendant asked for a piece of paper and pencil "so he could work out [a] question," *id.* at 34:12-13, and "trace[d] letters on his leg, almost as if [he was] trying to visualize the letters [Dr. Corvin] had given him so that he could then repeat them back." *Id.* at 34:3-5.

[33]     Dr. Corvin testified that effort testing requires the involvement of a psychologist – a cost of "at least $3,000." *Id.* at 67:20-25.

[34]     *Id.* at 94:23-24.

[35]     *Id.* at 39:13-16; *see id.* at 64:12-18 (stating Defendant's "lack of effort is a lack of – I think it's a direct side effect of his . . . traumatic brain injury).

[36]     Dr. Corvin's diagnoses are based on the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V"). [DE 447 at 11].

(3) alcohol use disorder, (4) antisocial personality traits versus disorder, by history, (5) traumatic

brain injury, (6) post-traumatic seizure disorder, (7) persistent depressive disorder (dysthymia),

(8) sarcoidosis[37] and (9) problems related to crime or interaction with the legal system.[38]

Defendant's brain injury played a "pivotal" role in Dr. Corvin's assessment.[39] Dr. Corvin

testified that Defendant's "major neurocognitive disorder" is the result of his brain injury.[40] Also,

Dr. Corvin attributed numerous issues to Defendant's TBI, including (1) Defendant's post-

traumatic seizure disorder,[41] short-term memory loss, apathy, frustration and "becoming easily

overwhelmed,"[42] (2) his impaired ability to take care of himself, make decisions and compare

information[43] and (3) his "tend[ency] to come across as unable to try."[44]

When questioned about sarcoidosis as a mental condition, Dr. Corvin explained because

sarcoidosis reduces blood oxygen levels to the brain, it can affect an individual's energy level,

"brain functioning" and concentration abilities.[45] Dr. Corvin also stated that meningioma can

impact brain functioning to the extent "it pushes down on areas of the brain" and causes pain,

---

[37]    Mr. Lapin testified that sarcoidosis is not in the DSM-V because it is a "medical condition" and not a "psychological issue." Tr. at 191:14-21.

[38]    [DE 447 at 11].

[39]    Tr. at 58:23-24.

[40]    *Id.* at 118:18-21.

[41]    According to Dr. Corvin, Defendant's seizure disorder is under control and has no direct impact on Defendant's competency. *Id.* at 105:10-24.

[42]    *Id.* at 15:14-15, 20:12-14, 21:6-9, 24:9-11.

[43]    *Id.* at 31:1-5.

[44]    *Id.* at 32:22-25.

[45]    *Id.* at 15:21-22, 17:19-11, 23:1-16, 24:1-5.

discomfort or seizures.[46]

In Dr. Corvin's professional opinion, Defendant "does not possess the requisite skills mandated under . . . federal law to be viewed as competent and . . . [is] not capable of proceeding [to trial] at this time."[47] Dr. Corvin explained that Defendant's competency is not impacted by any single issue.[48] Rather, it is affected by "the physical effects and the psychological effects of a possible meningioma, of a prior brain injury, of his sarcoidosis, of his pre-existing intellectual limitations and his depression"[49] as well as "recurring headaches, either as a lingering effect of the [1999 car] accident or perhaps from the meningioma."[50]

## C.    Mr. Lapin's Report and Testimony

Mr. Lapin's report reflects personal and staff observations, telephone consultations with Demetrius Myles (Defendant's cousin), defense counsel and counsel for the Government, a clinical interview, competency restoration group classes, and a battery of psychological tests, in addition to discovery materials in this matter (approximately 55 compact discs), two phone calls made by Defendant while at Butner and the records noted in Part II(A) *supra*. Defendant's competency evaluation took approximately seventy-five days.[51]

---

[46]    *Id.* at 24:1-5.

[47]    *Id.* at 49:12-13.

[48]    *Id.* at 114:6-9.

[49]    *Id.* at 15:16-17, 18:7, 24-25, 19:1-2, 42:25, 43:1.

[50]    *Id.* at 25:21-22, 43:20-21.

[51]    *Id.* at 135:9-11.

1.    Screening and Physical Examination

Defendant was initially screened on September 28, 2015.[52]   Defendant was observed as cooperative but guarded and he maintained poor eye contact.    Defendant's speech was appropriate and relevant to questions presented although Defendant generally paused for long periods of time before answering questions and provided "minimal verbal responses."    As Defendant expressed no suicidal or homicidal ideations, he was assigned to a general population housing unit where he remained for the duration of his stay.[53]

Defendant underwent a "routine physical" examination by Butner medical staff on September 29, 2015.[54]   Defendant was described as alert and oriented.    Defendant's thought process was described as goal-directed, which Mr. Lapin testified indicates an ability to "carry on a meaningful dialogue" and provide relevant responses to questions.[55]   During his physical examination, Defendant reported a history of seizure disorder, pneumonia and "lung issues" and provided a list of his medications, which are either seizure- or lung-related.[56]

2.    Psychological Testing

During the month of October 2015, Butner psychology interns administered the following psychological tests to Defendant: (1) the Minnesota Multiphasic Personality Inventory-2 ("MMPI"); (2) the Shipley-2; (3) the Validity Indicator Profile ("VIP"); and (4) Test of Memory

---

[52]    *Id.* at 150:4-7.  Mr. Lapin testified that upon arrival, Defendant initially thought he was at Butner for medical treatment. After Mr. Lapin and Dr. Lloyd advised Defendant that he was at Butner to undergo a forensic evaluation, Defendant "understood that he was there for an evaluation and he repeated that back to us and agreed to participate." *Id.* at 135:19-25.

[53]    *Id.* at 150:7-14, 23-25, 151:1-16.

[54]    *Id.* at 152:6-10.

[55]    *Id.* at 152:6-25, 153:1-2.

[56]    *Id.* at 154:4-9.

Malingering ("TOMM"). Mr. Lapin testified that during the administration of these various assessments, Defendant "frequent[ly]" complained of headaches or expressed "concern about seizure activity."[57]

The MMPI assesses an individual's psychological functioning. It is an untimed test consisting of 338 true/false items and can be taken in parts.[58] During the MMPI, Defendant asked numerous questions, stated he did not understand certain words and questioned whether he should answer certain questions. Ultimately, Defendant chose to discontinue the test after "70 or so minutes" and declined the offer to take it in parts.[59] Due to the number of unanswered questions, no information about Defendant's psychological functioning could be gleaned from the MMPI.[60] Retesting Defendant's psychological functioning was unnecessary because it was evident throughout the course of the evaluation period that Defendant would not complete the alternative psychological functioning measure.[61]

The Shipley-2 is a timed measure of cognitive functioning and is divided into two parts – the vocabulary subtest and the block design subtest.[62] The vocabulary subtest is a 10-minute test consisting of 40 questions. The block design subtest is a 12-minute test consisting of 12 questions. Mr. Lapin described Defendant's performance as "a big deviation from what [psychologists] would see even with individuals with a true cognitive disability."[63] Defendant's

---

[57]        *Id.* at 175:1-7, 198:4-6.

[58]        *Id.* at 164:7-8, 13, 19, 165:2, 166:14.

[59]        *Id.* at 165:18-25, 166:15-19.

[60]        *Id.* at 215:4-12.

[61]        *Id.* at 169:24-25.

[62]        *Id.* at 169:2-8.

[63]        *Id.* at 169:9-13.

scores were not interpreted and he was not retested based on his "pattern" of not putting forth "strong effort."[64]

The VIP assesses an individual's effort and motivation during cognitive testing and is divided into two parts – the verbal subtest and the nonverbal subtest. Its aids in, *inter alia*, the determination of whether an individual's performance on cognitive testing should be deemed representative of the individual's true intellectual abilities.[65] Defendant completed the nonverbal subtest, however, he answered only 3 of the 78 items on the verbal subtest.[66] Defendant's score "indicated that he was somebody that to some extent tried a little bit on some of the questions, but overall provided very poor effort and was indicative of somebody that was more or less randomly responding to item content."[67]

The TOMM is a 50-item visual recognition test that discriminates between true memory impairment and malingering.[68] After an individual is shown 50 pages, each containing a picture, he is then shown a page containing two pictures and asked to select the picture seen previously.[69] The TOMM is "normed on individuals who have severe traumatic brain injury [and] different neurocognitive disorders."[70] Mr. Lapin administered this test to Defendant because of his

---

[64]     *Id.* at 171:12-14.

[65]     *Id.* at 172:23-25, 173:5-9, 20-21.

[66]     *Id.* at 174:11-15.

[67]     *Id.* at 174:3-7.

[68]     *Id.* at 175:24-25, 177:1-2, 179:14-16.

[69]     *Id.* at 179:1-8.

[70]     Mr. Lapin explained that "normed" means "a group of individuals who had severe traumatic brain injury took the TOMM and scored above a specific score." *Id.* at 178:5-8.

memory complaints.[71] Defendant scored "very poorly" and "his results [were] indicative of very

poor effort."[72] Mr. Lapin testified that individuals suffering from dementia and "significant

intellectual disabilities . . . tend to score 90 percent or better on the TOMM, meaning even an

individual who is very very impaired . . . does relatively well on the TOMM."[73] Defendant,

however, scored only 48 percent, 58 percent and 70 percent on the three trials administered to

him.[74] While Defendant actually completed this assessment, it took him 70 minutes to do so.

According to Mr. Lapin, his administration of the TOMM never exceeded 30 minutes prior to

testing Defendant.[75]

When asked to explain the rationale for not assessing Defendant a malingering diagnosis

on the TOMM, Mr. Lapin testified that poor effort "seems to be [Defendant's] pattern of

behavior . . . [as] documented across multiple evaluations" prior to his head injury and his arrival

at Butner.[76] Mr. Lapin testified further that no "strong evidence" existed indicating Defendant

"was trying to do anything for secondary gain . . . . He's not, for example, malingering

psychiatric symptoms, he's not saying he's hearing voices when he's not, he's not doing anything

of the sort." Rather, "he's just not giving good effort."[77]

---

[71]     *Id.* at 175:21-23, 177:3-5.

[72]     *Id.* at 179:18-19.

[73]     *Id.* at 177:17-23.

[74]     *Id.* at 180:1-4.

[75]     *Id.* at 181:3-6.

[76]     *Id.* at 192:2-8.

[77]     *Id.* at 192:9-19.

In sum, Defendant's effort on these various testing measures was poor despite encouragement to complete these measures and to make his best guess.[78]   While conceding factors such as poor memory, a limited education and a history of childhood behavioral problems could contribute to Defendant's poor effort, Mr. Lapin testified that based on the measures Defendant completed, "his scores were significantly away from individuals that did have severe problems and problems that are congruent with [such factors]."[79]   Rather, it was Mr. Lapin's opinion that Defendant's poor performance was part of a "pretty significant and consistent pattern of [Defendant's] behavior [i.e., being uncooperative] that just happens all the time . . . suggest[ing] [Defendant] didn't want to engage in the testing."[80]

3.   Diagnoses

Mr. Lapin assigned Defendant the following mental disorder diagnoses:[81] (1) antisocial personality disorder, (2) major depressive disorder, single episode, mild (provisional), and (3) alcohol use disorder, mild in a controlled environment.[82]

Mr. Lapin disagreed with the "intellectual developmental disorder" diagnosis assigned by both Ms. Weeks and Dr. Corvin.[83]   According to Mr. Lapin, this diagnosis depends on three factors: conceptual (or cognitive ability), social and practical.[84]   Because Defendant has

---

[78]      Mr. Lapin stated that standardized test procedure requires the test administrator to encourage individuals to make their best guess. *Id.* at 169:16-17, 170:20-23.

[79]      *Id.* at 199:8-16

[80]      *Id.* at 199:4-7.

[81]      Mr. Lapin's diagnoses are based on the DSM-V.  [DE 347 at 10].

[82]      *Id.* at 185:12-16.

[83]      *Id.* at 189:13-25.

[84]      *Id.* at 190:2-3.

"consistently given poor effort throughout his life," Mr. Lapin stated a definitive opinion cannot be rendered as to Defendant's cognitive ability. Regarding the social factor, Defendant "engaged in relationships prior to and after his head injury." Also, Mr. Lapin and other staff members observed Defendant "socializing appropriately" with other inmates. Similarly, behavioral observations by Mr. Lapin and staff members during Defendant's evaluation period indicated Defendant "functioned well."[85] Finally, Mr. Lapin testified that his review of discovery in this matter (consisting of 55 compact discs) revealed "no evidence of any type of impairment." Transcripts of phone calls indicated Defendant "was aware of what he was doing," he had "no . . . difficulties communicating" and his speech was "goal-directed."[86]

Mr. Lapin also questioned Ms. Weeks' reliance on Defendant's WAIS full scale IQ of 52. First, Mr. Lapin stated that in his opinion, Defendant's WAIS score "can't be interpreted as valid" due to Ms. Weeks' failure to first assess effort. According to Mr. Lapin, it is "standard practice to administer effort measures before administering a full-on cognitive assessment such as the WAIS-IV, because otherwise . . . the results don't really mean anything."[87] Second, Mr. Lapin stated that Defendant did not demonstrate significant impairment in daily functioning that individuals with similar WAIS scores demonstrate. In particular, Mr. Lapin stated such individuals have difficulty maintaining hygiene, remembering medications and appointments and keeping a job as well as social difficulties. During Defendant's evaluation period at Butner, however, he functioned "very very well" and he never demonstrated any functional limitations

---

[85]     *Id.* at 190:6-20.

[86]     *Id.* at 190:21-25, 191:1-11.

[87]     *Id.* at 209:22-25; *see also id.* 145:16-18, 23-25, 147:4-7 (stating based on his experience as a forensic psychologist, he has "never encountered a situation where we've given a full cognitive measure without assessing an individual's effort first with a psychological assessment tool").

during the evaluation period.[88]  For example, Defendant "cleaned his clothes," "never appeared malodorous," attended group meetings without reminders and "engaged with his peers."[89]  In fact, "a lot of times it seemed like [Defendant] had some friends around there and he would engage with them, laugh, tell jokes, just kind of chitchat about life."[90]

Mr. Lapin also expressed disagreement with Dr. Corvin's major neurocognitive disorder diagnosis.  First, Mr. Lapin testified that such a diagnosis is not possible "without formal neuropsychological testing, which has never, to [his] knowledge, been administered to" Defendant.[91]  Second, while agreeing a traumatic brain injury can affect an individual, Mr. Lapin opined that in Defendant's case, "there's nothing to suggest that there's been a significant decline in functioning."[92]  Mr. Lapin cited, for example, Defendant's pattern of behavior both pre- and post-head injury.  Mr. Lapin noted in particular that Defendant's behavior pattern demonstrates "he used substances before and after his head injury, engaged in relationships before and after, gave poor effort before and after, and got in trouble with the legal system before and after," concluding "it's too consistent of a pattern and it's hard to see any real impairment."[93]  Mr. Lapin also cited Defendant's TOMM scores, which deviated "vast[ly]" from the typical individual suffering from "a severe traumatic brain injury or a major neurocognitive disorder or someone

---

[88]     *Id.* at 161:13-20.

[89]     *Id.* at 162:2-5, 8-11.

[90]     *Id.* at 162:5-7.

[91]     *Id.* at 227:3-5.

[92]     *Id.* at 213:14-16; *see id.* at 227:5-9 (testifying also that "there's been no difference in his adaptive functioning prior to and after his head injury, it's been the same consistent pattern of behavior, and nothing suggests that there is impairment in that respect").

[93]     *Id.* at 213:17-22.

with an intellectual disability."[94] Mr. Lapin testified that he has "administered [the TOMM] to individuals who have had brain injuries, . . . a bona fide dementia, and the common theme was that these [individuals] . . . score[d] above 90 percent."[95]

When questioned about meningioma's potential effect on an individual's competency generally, Mr. Lapin stated it "could impact [an individual's] competency." However, he did not think such impact was "likely" in Defendant's case.[96] Mr. Lapin based his opinion on behavioral observations made by him and other staff members (including "nursing, medical [and] custody") over the course of Defendant's evaluation period.[97] These observations led Mr. Lapin and other staff members to conclude that Defendant "lack[ed] motivation to put forth good effort unless he was motivated to do so."[98] For example, Mr. Lapin testified about one occasion during which he observed Defendant "talking to other inmates" and engaging in clear and concise speech without delay, projecting when he spoke and laughing and smiling. When he approached Defendant, however, Defendant's "presentation shifted" and he began acting "confused" and "started breathing heavily."[99] Mr. Lapin testified that this observation was a "constant theme . . . hear[d] from other staff members."[100]

---

[94]     *Id.* at 180:6-9; *see also id.* at 200:2-7 (stating Defendant's TOMM score is "significantly below what [one] would expect from an individual with a traumatic brain injury or a significant neurocognitive disorder").

[95]     *Id.* at 180:13-16.

[96]     *Id.* at 157:8-15.

[97]     *Id.* 157:25, 158:1, 9-10.

[98]     *Id.* at 157:24-25.

[99]     *Id.* at 158:17-23.

[100]    *Id.* at 158:24-25.

According to Mr. Lapin, when Defendant is "motivated, for example, to . . . obtain something he wants, his presentation switches. . . . [T]here were times where . . . he . . . ask[ed] something about his medical concerns and he was . . . very alert, no delays," his questions were "relevant" and he spoke "in a normal pitch, volume."[101] As an example, Mr. Lapin testified that after a staff member secured Defendant's signature on "some form of consent," Defendant expressed concern about the form to Mr. Lapin. Defendant's "presentation was completely different than how he typically was when [Mr. Lapin or other staff] were trying to evaluate him or when [Mr. Lapin] observed him in groups."[102] As a second example, Mr. Lapin testified that during "competency restoration" group meetings (a psychoeducational group that aids inmates in their understanding of the legal system), Defendant "acted very confused" whenever Mr. Lapin discussed Defendant's charges or asked Defendant questions "related to the legal system."[103] Yet, during a review of a phone call Defendant made to his girlfriend, Defendant's "speech was goal directed, to the point, he knew what he was talking about and he flat out stated that he was facing a minimum of ten years in prison."[104]

In Mr. Lapin's professional opinion, Defendant does not suffer from a mental disease or defect that would impair his ability to remain competent.[105] Rather, according to Mr. Lapin, Defendant suffers from a lack of motivation.

---

[101]    *Id.* at 159:5-8, 163:5-9.

[102]    *Id.* at 159:9-17.

[103]    *Id.* at 159:18-22, 160:11-14.

[104]    *Id.* at 160:19-22.

[105]    *Id.* at 193:18-23.

## III.   APPLICABLE LAW

The Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial. *See Ryan v. Gonzales*, __ U.S. __, 133 S. Ct. 696, 703 (2013); *see also Eddmonds v. Peters*, 93 F.3d 1307, 1314 (7th Cir. 1996) ("The Constitution forbids trial of one who, for whatever reason, is [mentally incompetent] because our adversarial system of justice depends on vigorous defenses."). A defendant is legally competent if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960); *see* 18 U.S.C. § 4241(a) (phrasing test as whether defendant is "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense"). Mental illness is not dispositive of incompetence. *See Nachtigall v. Class*, 48 F.3d 1076, 1081 (8th Cir. 1995) ("Mental illness and legal incompetence are not identical, nor are all mentally ill people legally incompetent."); *accord Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000). "Likewise, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Burket*, 208 F.3d at 192.

In assessing competency, a court may rely on several factors, including but not limited to, medical opinions and testimony,[106] lay testimony, the court's observations of the defendant's demeanor and behavior and the observations of other individuals who have interacted with defendant. *See, e.g.*, *United States v. Speelman*, No. 7:15-CR-69-FL-1, 2016 U.S. Dist. LEXIS 72012, at *20 (E.D.N.C. June 2, 2016) (citing *United States v. Mitchell*, 706 F. Supp. 2d 1148,

---

[106]     "The medical opinion of experts as to the competency of a defendant to stand trial is not binding on the court since the law imposes the duty and responsibility for making the ultimate decision on the legal question on the court and not upon medical experts." 8A Federal Procedure, Lawyer's Edition § 22:575.

1151 (D. Utah 2010)); *U.S. v. Simpson*, 645 F.3d 300, 306 (5th Cir. 2011). Defendant bears the burden by a preponderance of the evidence of demonstrating that he is not competent to stand trial. 18 U.S.C. § 4241(d); *United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005). A defendant who is found incompetent shall remain in federal custody and be held in an appropriate facility for a reasonable period of time as is necessary to attain the capacity to permit the proceedings against him to continue. 18 U.S.C. § 4241(d).

## IV.    DISCUSSION

Based upon a careful consideration of the record, the experts' competency reports and their testimony at the hearing, the court finds Defendant fails to carry his burden of demonstrating by a preponderance of the evidence that he is unable to either understand the nature of the proceedings against him or to effectively assist in his defense as required. Defendant "has a rational as well as factual understanding of the proceedings against him" and "has sufficient present ability to *consult with his lawyer* with a reasonable degree of rational understanding." *Indiana v. Edwards*, 554 U.S. 164, 170 (2008). While Defendant's intellectual capabilities may be limited (the evidence is inconclusive), other factors – such as collective observations of Butner staff that Defendant carried out animated and normal conversations outside of formal settings, the change in Defendant's "presentation" when motivated, and discovery materials indicating a lack of impairment – weigh in favor of finding him competent.[107]

In finding Defendant competent, the court credits Mr. Lapin's opinion over Dr. Corvin's opinion. *See United States v. DeCoteau*, 630 F.3d 1091, 1096 (8th Cir. 2011) (stating that when

---

[107] It appears from Mr. Lapin's December 9, 2015 report that, pursuant to 18 U.S.C. § 4242, Defendant was not insane at the time of the offense charged and was able to appreciate the nature and quality or the wrongfulness of his actions at the time of the offense. However, the court makes no finding as to Defendant's sanity at the time of the offense charged.

presented with different conclusions from experts on a motion to determine competency that it is "certainly within a district court's province to choose one expert's opinion over a competing qualified expert's opinion" (internal quotation marks and quotation omitted)). Although both experts are capable professionals, the court views Mr. Lapin's evaluation as more complete and more reliable than Dr. Corvin's. *See Ake v. Oklahoma*, 470 U.S. 68, 81 (1985) (observing that "[p]sychiatry is not . . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms [and] on cure and treatment . . . ."). In weighing their opinions, the court considered each expert witness's familiarity with and exposure to Defendant, the thoroughness of the evaluation performed, and the care with which the respective experts reached their conclusions.

## A.    Exposure to Defendant

Mr. Lapin's opinion is based on over two months of observing Defendant, who engaged with other inmates, attended meetings without reminders and maintained appropriate grooming. In so noting, the court does not imply that the amount of time each expert spent with Defendant is determinative. It is doubtful the defense would ever have the same access to a prisoner that institutional mental health experts have. In this case, however, the collective observations of Mr. Lapin and other Butner staff are significant because the evidence of incompetency centers largely on symptoms of borderline intellectual functioning and a traumatic brain injury, such as communication difficulties, headaches, attention problems and poor short-term memory. As Dr. Corvin testified, "they [i.e., Butner staff] have him in the hospital, so there's a wealth of observational data that I don't have other than that it's reported."[108] This data demonstrates a functioning level above that indicated by Defendant's test results.

---

[108]    *Id.* at 91:22-24.

**B.     Thoroughness of the evaluation performed**

Second, Mr. Lapin's opinion is based on numerous well-supported tests as well as prior experience working in a traumatic brain injury clinic. According to Mr. Lapin, Defendant's test results are not sufficiently reliable due to evidence of a lack of effort – an opinion not undermined by Dr. Corvin's testimony to the contrary. In particular, Dr. Corvin testified that Defendant's "lack of effort" is an "organic effect" of the totality of Defendant's "conditions . . . but first and foremost an effect of his brain injury."[109] In reaching this conclusion, Dr. Corvin relied on the diagnosis of "major neurocognitive disorder."[110] In disagreeing with this diagnosis, Mr. Lapin noted the following: (1) such diagnosis is only possible upon administration of "formal neuropsychological testing" and Defendant's record is devoid of such evidence; (2) Defendant's TOMM scores deviated substantially from individuals suffering from "a severe traumatic brain injury or a major neurocognitive disorder or someone with an intellectual disability;"[111] and (3) the record is devoid of evidence indicating a significant decline in Defendant's functioning following his brain injury. Mr. Lapin noted further that it is "common practice" to "give effort testing" prior to administering a cognitive assessment. As Dr. Corvin conceded, in most of his cases, effort testing is the norm.

**C.     Care exercised in reaching competency conclusions**

Finally, Dr. Corvin's failure to review key discovery materials renders his conclusion in this matter less credible than that of Mr. Lapin. Mr. Lapin set out a detailed and thorough explanation during the hearing for his competency opinion, providing well-reasoned responses

---

[109]     *Id.* at 39:13-16.

[110]     *Id.* at 118:19.

[111]     *Id.* at 180:6-9.

supporting his conclusion that Defendant's traumatic brain injury played a less pivotal role than claimed by Dr. Corvin. For example, addressing Dr. Corvin's "intellectual disability disorder" diagnosis, Mr. Lapin opined that the discovery materials did not support such a diagnosis. In fact, according to Mr. Lapin, in reviewing the wiretap transcripts, "it appeared [Defendant] was aware of what he was doing, there was no . . . difficulties communicating, his speech was very goal directed, and there was nothing to suggest any impairment there."[112]

Dr. Corvin, on the other hand, although aware of the wiretap investigation in this matter and cognizant of a "tremendous amount of discovery records" in this case, did not review any discovery material.[113] Yet, Dr. Corvin acknowledged that copies of the wiretapped conversations between Defendant and his co-defendants "could be very important" in rendering an opinion as to Defendant's competency.[114] Given the reported disparities in Defendant's behavior, an evaluation that compares Defendant's conduct during periods of formal observation to his conduct when he was unaware that he was being observed is inherently more credible than one that fails to do so.

---

[112]     *Id.* at 191:5-11.

[113]     *Id.* at 45:20-21, 53:1-2, 12-16; *see id.* at 110:15-16 (noting defense counsel did not provide any discovery materials).

[114]     *Id.* at 53:14-25, 54:1-11.

## V.     CONCLUSION

For the foregoing reasons, Nathune Jamerson Myles is DECLARED mentally competent

to stand trial.

SO ORDERED.

This the 24th day of August, 2016.

*James C. Fox*

**JAMES C. FOX**
Senior United States District Judge